UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAPRICE MCCRARY,

        Plaintiff,        Civil Case No. 14-14053
                                      Honorable Linda V. Parker

v.

OAKWOOD HEALTHCARE, INC.,

        Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This lawsuit arises from an incident where a patient at Defendant's hospital refused Plaintiff's care because she is African-American. Plaintiff charges Defendant with race discrimination in violation of 42 U.S.C. § 1981 and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") as a result.[1] Presently before the Court is Defendant's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 on August 28, 2015. (ECF No. 21.) The motion has been fully briefed. (ECF Nos. 22, 23.) The Court held oral argument with respect to Defendant's motion on February 9, 2016. For the reasons that follow, the Court is denying the motion.

---

[1] Plaintiff asserted a claim of intentional infliction of emotional distress in her Complaint; however, she concedes to the dismissal of this claim in response to Defendant's motion. (ECF No. 22 at Pg ID 163 n.1.) Defendant construed Plaintiff's Complaint as also alleging a hostile work environment claim under § 1981 and the ELCRA. Plaintiff indicates in her response brief that she is not asserting such a claim. (*Id*. at Pg ID 173 and n.2.)

## I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including

2

depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual Background

In May 2013, Plaintiff began working as a respiratory therapist at Oakwood Hospital ("Oakwood" or "hospital") in Dearborn, Michigan. (ECF No. 22, Ex. 1 at 13-15, 18, 47.) Plaintiff is African American. She is a very good therapist, is hard-working, and is qualified to do her job. (*Id*., Ex. 3 at 15.) Oakwood in fact has selected Plaintiff before as its "Employee of the Quarter." (ECF No. 21, Ex. 1.)

Plaintiff typically works a shift from 6:30 p.m. to 6:30 a.m., three days a week. (ECF No. 22, Ex. 1 at 8.) Elisa Benscoter, the manager of the Respiratory Care Department, has been Plaintiff's supervisor throughout Plaintiff's employment at Oakwood. (*Id*. at 29; Ex. 3 at 6, 8.) Benscoter usually works a ten-hour shift beginning at 5:30 or 6:00 a.m. (*Id*., Ex. 3 at 8-9.) When Benscoter is not at the hospital, Plaintiff reports to a senior respiratory therapist or charge therapist. (*Id*. at 10-11.) Holly McShane is one of those senior respiratory therapists. (*Id*. at 11.)

On October 8, 2014, at approximately 1:43 p.m., a patient was admitted to Oakwood's Emergency Room Department. He was experiencing shortness of breath and had a collapsed lung. (ECF No. 22, Ex. 4 at 26-27.) Angela Gilhooly, a nurse in training at the time, tended to the patient. (*Id*. at 10, 18-19.) After the patient was

3

stabilized, he told Gilhooly that he did not want any black people taking care of him during his stay. (*Id*. at 10.) Gilhooly left the room and told her preceptor (i.e., a registered nurse who supervises a nurse in training), who told Gilhooly to notify the charge nurse and put the statement in the patient's record. (*Id*. at 10, 19.) Gilhooly claims that she contacted the charge nurse by phone. (*Id*. at 11.) At the time of her deposition in this case, Gilhooly could not recall the name of the charge nurse she contacted or the charge nurse's response when Gilhooly shared the patient's comment. (*Id*. 11-12.)

In its Answers to Plaintiff's Interrogatories, Defendant identified Cheryl Aerson as the charge nurse for that day and time. (ECF No. 22, Ex. 10.) Aerson was an Assistant Clinical Manager in Oakwood's Emergency Department in October 2014. (*Id*., Ex. 2 at 6.) Aerson testified during her deposition in this case that although she was told that she worked on October 8, 2014, and typically worked the 6:00 a.m. to 6:00 p.m. shift, she would not have been a charge nurse then. (*Id*. at 6-9.) Aerson further testified that she was unaware of the patient's request on October 8 and would remember if she had been told about it. (*Id*. at 7, 11.) Counsel for the parties informed the Court at the motion hearing that they have not been able to identify who else may have been the charge nurse on duty when the patient made the request to Gilhooly.

According to Gilhooly, she was directed by her preceptor to note the patient's request in his record. Gilhooly therefore made the following notation in his record:

4

"Pt made a request to writer stating 'I do not want any black people taking care of me at all.' Writer notified charge nurse of request." (ECF No. 21, Ex. 8.) Gilhooly did not make a note in the patient's record with respect to whether or not Oakwood would honor his request. (*Id.*) Gilhooly testified during her deposition that she never told the patient that his request would be granted. (ECF No. 22, Ex. 4 at 27.) She also testified that if the charge nurse had told her to advise the patient that his request was denied, she would have noted that in his record. (*Id.* at 16.)

Oakwood's Manager of Patient Relations and Service Excellence, Rhonda Jordan, is not aware of Defendant having a written policy precluding employees from granting a patient's request for care based on race. (ECF No. 22, Ex. 5 at 9.) Nevertheless, Jordan recalled five or six prior occasions during her twelve year tenure at Oakwood when she learned of patients requesting a specific caregiver based on the worker's protected class. (*Id.* at 6, 8-9.) According to Jordan, on those occasions, Oakwood denied the patient's request. (*Id.* at 9.) Oakwood does have a written policy promoting "the practice of providing an equal employment opportunity for all persons" which also provides "that all employees have the right to work in an environment free from discrimination relating to the privileges of employment." (ECF No. 21, Ex. 4 at Pg ID 113.)

At some point on October 8, the patient was transferred from the Emergency Room Department to the hospital's fourth floor. Plaintiff was assigned to provide respiratory care on that floor during her overnight shift spanning October 8-9. At

5

12:14 a.m. on October 9, a male nurse called Plaintiff to the patient's room to do a breathing treatment. (ECF No. 22, Ex. 1 at 49.) After Plaintiff entered the patient's room and began to introduce herself to him, the patient told Plaintiff that she had to leave and that she must not have read his chart. (*Id.* at 51.) When Plaintiff attempted to log onto the computer in the room to review his chart, the patient told her to leave the room. (*Id.* at 67.)

Plaintiff summoned the nurse who called her to the room, told the nurse that she is not allowed in the room, and asked the nurse to find out why. (*Id.* at 67.) The nurse went into the patient's room and, when he came back into the hallway, told Plaintiff that it is because she is black. (*Id.* at 67-78.) The nurse asked Plaintiff if there was someone else she could get to do the treatment, but no other respiratory therapist was available. (*Id.* at 69-71.) Plaintiff made a note in the patient's Progress Report: "Was called to give patient breathing treatment. As I introduce myself to the patient, he replied that I must leave, because he will not have any treatment given by me because I was Black." (ECF No. 22, Ex. 7.)

Several hours later, the same nurse called Plaintiff to the patient's room to do a breathing treatment. (*Id.*, Ex. 1 at 50.) When Plaintiff arrived at the door to the patient's room, she called to the nurse and told him that she was the respiratory therapist responding to the call and to ask the patient whether she could do the treatment. (*Id.* at 72.) When the nurse returned to Plaintiff, he told her that the patient

6

would wait until shift change. (*Id.*) Plaintiff made a note in the patient's Progress Report that he again refused to be treated by Plaintiff. (*Id.*, Ex. 8.)

During her shift, Plaintiff informed McShane about the patient's refusal to be treated by Plaintiff because of her race. (*Id.*, Ex. 1 at 99.) When Benscoter arrived at the hospital at around 5:30 on the morning of October 9, McShane approached Benscoter and told her that Plaintiff wanted to speak with her about the incident that occurred. (ECF No. 21, Ex. 3 at 16.) Before Benscoter could look for Plaintiff, however, Plaintiff found her and told her about the incident. (*Id.*; ECF No. 22, Ex. 1 at 102) After Benscoter spoke with Plaintiff and met with her staff to get the morning shift started, she went to the fourth floor to report the incident to the Assistant Clinical Manager, Courtney Taylor. (ECF No. 21, Ex. 3 at 22-23; Ex. 6 at 14.) Benscoter also planned to contact Human Resources. (*Id.*)

When Benscoter arrived at Taylor's office, however, David Squires, a manager from Human Resources, already was there discussing the incident with Taylor. (*Id.*) Sometime after seven o'clock, Plaintiff had called Human Resources from her home and had spoken with Sherry Huffman. (ECF No. 22, Ex. 1 at 106.) During that conversation, Plaintiff told Huffman about the incident with the patient the night before. (*Id.* at 107.) Huffman apologized to Plaintiff, said that the request should never have been in the chart, and indicated that she would look into it and call Plaintiff later. (*Id.*) Squires informed Benscoter that he and Taylor were going to go and speak with the patient. (ECF No. 21, Ex. 3 at 24.)

7

Squires in fact contacted Oakwood's Patient Relations Representative, Rhonda Jordan, and asked that she speak with the patient and explain that Oakwood would not meet the patient's request to not be treated by black employees. (*Id*., Ex. 6 at 7-8.) Jordan and Taylor then went to the patient's room. (*Id*. at 14.) After introducing themselves, Jordan explained to the patient that the hospital could not grant his request to not have African American people care for him. (*Id*.) Jordan told the patient that Oakwood is a diverse hospital, that all of its employees are competent and professional equally, and that "if he wasn't happy, he could choose his services elsewhere." (*Id*.) At 11:58 a.m. on October 9, 2014, Taylor made a note in the patient's record reflecting the discussion, writing: "Patient informed that hospital unable to grant request for racial choice of staff. Rhonda Jordan at bedside from guest relations." (ECF No. 21, Ex. 13.) During her deposition, Jordan claimed that she and Taylor had met with the patient a couple of hours earlier than when the record entry was made, as she recalls doing so within an hour of her arrival at work. (*Id*., Ex. 6 at 17.)

Squires, Huffman, and Plaintiff's director called Plaintiff at around 4:30 p.m. on October 9, after Jordan's and Taylor's conversation with the patient. (ECF No. 22, Ex. 1 at 108.) According to Plaintiff, they told her that they had someone meet with the patient and "let him know that that couldn't go on." (*Id*. at 110.) Plaintiff indicated that they also were apologetic, said it never should have happened, and asked Plaintiff if she was afraid of the patient and wanted a different assignment or

8

wanted someone to go in the patient's room with her to treat him. (*Id*. at 110-11.) Plaintiff responded that she was not afraid and that she did not need someone to go into the patient's room with her if they had talked to him and he understood that they were all there to help him. (*Id*.) However, when Plaintiff arrived at work that evening, she learned that the patient had been moved to a different floor to which she was not assigned. (*Id*. at 111.)

According to Benscoter, the patient was moved from the fourth floor (where Plaintiff was assigned) to the seventh floor, a surgical floor, because he was ultimately getting surgery at Oakwood. (ECF No. 21, Ex. 3 at 49.) The record fails to reflect when this surgery took place. According to Defendant's Answers to Plaintiff's Interrogatories, at least eleven African American caregivers treated the patient during his remaining stay at Oakwood. (*Id*., Ex. 14 at Pg ID 148.)

## III. Applicable Law and Analysis

Plaintiff claims that Defendant's response to the patient's request to not be treated by African American caregivers during his stay at Oakwood constitutes race discrimination in violation of § 1981 and ELCRA.[2] As Plaintiff clarifies in response to Defendant's motion, she is contending that Defendant violated § 1981 and the

---

[2] As Defendant points out, Plaintiff bypassed the Equal Employment Opportunity Commission and filed this lawsuit within two weeks of the incident. Because she did not file an EEOC complaint, she cannot maintain a cause of action under Title VII of the Civil Rights Act of 1964. *See Young v. DaimlerChrysler Corp.*, 52 F. App'x 637, 639 (6th Cir. 2002) (citing 42 U.S.C. § 2000e-5(e)).

9

ELCRA by allowing the assignment of its employees to care for the patient based on race. (ECF No. 22 at Pg ID 174-75.)

Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (citing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867-68 (6th Cir. 2001)). "The statute's protection extends to 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.' " *Id.* (quoting 42 U.S.C. § 1981(b)). "Section 1981 liability must be founded on purposeful discrimination." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982)). "[P]roof of discriminatory intent is essential" to prove a violation of the statute. *Id.* (citing *Gen. Bldg. Contractors*, 458 U.S. at 388).

The ELCRA similarly prohibits "discriminat[ion] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race." Mich. Comp. Laws § 37.2202(1)(a). Section 1981 and the ELCRA are analyzed under the same framework. *See Thompson v. City of Lansing*, 410 F. App'x 922, 934 (6th Cir. 2011) (unpublished) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the [ELCRA] under the same standards as claims for race discrimination brought under Title VII")).

10

A plaintiff claiming race discrimination under § 1981 must prove the following:

> that (1) [s]he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against h[er] on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a).

*Amini*, 440 F.3d at 358. The defendant's intent can be established by direct evidence or inferentially. *Id.* (citing *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985)). Plaintiff argues that Gilhooly's medical record entry restricted Oakwood's African American employees from caring for the patient and that such "segregation in assignments is discrimination and unlawful whether it is for one hour, o[ne] shift, 24 hours, days or weeks." (ECF No. 22 at Pg Id 181.) The Court finds sufficient evidence from which a reasonable jury could agree with Plaintiff.

As Jordan's testimony reflects, Oakwood is likely to have, and has had in the past, patients who request care based on the race of Oakwood's employees. There is no written policy instructing Oakwood's employees to reject the racial preferences of its patients. Oakwood also does not conduct any training or otherwise advise its employees on how to handle such race-based requests. Apparently, Oakwood's written equal employment policy is insufficient to advise its employees on how to confront such requests. Oakwood would lead this Court to believe that the failure to immediately address the patient's request in this case resulted from the fact that the employees it assigns to handle such requests do not work during the overnight shifts.

11

The patient was admitted to the hospital at approximately 1:43 p.m. (i.e., during the day shift), however, and Gilhooly recorded the patient's race preference request in his medical chart at 3:46 p.m. (also during the day shift). (ECF No. 21, Ex. 8.) This raises a question for the jury as to whether Oakwood would have ever addressed the request but for Plaintiff's complaints, or absent Plaintiff's complaints, would have simply left the request in the patient's chart to be followed by its employees.[3]

The result in this case, at least for one of Plaintiff's shifts, was that the patient's request was placed in his record and the patient believed the hospital was adhering to his request. Notably, Oakwood has not identified the nurse in charge to whom Gilhooly presented the patient's request. Thus there is a question raised as to what Gilhooly in fact was told with respect to how Oakwood would handle the patient's request. She certainly did not write in the patient's chart that the request would not be granted, which Gilhooly testified she believes she would have done had this been the instruction she was given. There also is a question of fact as to what credence the male nurse gave to the notation in the patient's record, as the record reflects that he

---

[3] Notably, a jury reasonably could conclude that if Jordan alone has become aware of at least six instances of patients making race preference requests, such incidents occur more frequently throughout Oakwood's various locations. The record does not reflect how often such requests are noted in patients' records, are not addressed, and therefore are left to impact the assignment of caregivers to those patients. Clearly it would be a burdensome task to make this determination. Nevertheless, a jury reasonably could conclude that patients' race-preference requests are effectively being granted by Defendant as a result of its instruction to their employees to include those requests in the patient's record (as Gilhooly was instructed) and its failure to train employees to address (i.e., deny) such requests.

asked Plaintiff to find someone else (i.e., a Caucasian respiratory therapist) to treat the patient. Finally, as the record fails to reflect when the patient actually underwent surgery, a question remains as to whether the patient was moved, when he was (i.e., before Plaintiff returned to work), to avoid Plaintiff being the respiratory therapist called to perform his needed breathing treatments.

In short, a reasonable jury could find that Defendant's failure to train its employees or provide a policy for handling race-based requests by patients results in those requests being placed in the patient's charts and honored unless and until an employee who is prevented from doing her job as a result of such a request complains. In other words, a reasonable jury could find that by recording patients' race-preference requests in the patients' record and not training its employees to reject those requests, Defendant purposefully allows for the assignment of its employees' duties based on their race. As such, this Court finds at least two of the cases cited by Plaintiff instructive in deciding that Plaintiff presents sufficient evidence to survive Defendant's summary judgment motion: *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908 (7th Cir. 2010) and *Patterson v. UPMC South Hills Health System Home Health, LP*, No. 03-89, 2005 U.S. Dist. LEXIS 47610 (W.D. Pa. 2005) (unpublished) (ECF No. 22, Ex. 11). Based on those cases, the Court finds that Plaintiff has presented sufficient evidence to establish the elements of her § 1981 and ELCRA claims.

Defendant nevertheless contends that Plaintiff's claims fail because she did not suffer an adverse action. Defendant argues that "[a]n employment action must amount to 'a materially adverse change' in the terms or conditions of employment to be actionable." (ECF No. 21 at Pg ID 90, quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 973 F.3d 876, 885 (6th Cir. 1996); *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004).) According to Defendant, "this one patient encounter did not alter Plaintiff's terms and conditions of employment." (*Id.*) This is because:

> Plaintiff has continued to treat patients of various races and ethnicities. . . . Her hours were not cut. . . . Her pay was not reduced. . . . She was not demoted or disciplined. Indeed, she continues to work in the same department of the hospital, treats patients, with the same title and with the same supervisor.

(*Id.*, citing Ex. 11.) As stated earlier, Plaintiff maintains that a "segregation in assignments is discrimination and unlawful whether it is for one hour, o[ne] shift, 24 hours, days or weeks." (ECF No. 22 at Pg Id 177, 181.)

As an initial matter, this Court does not believe that the existence of an "adverse action"-- as typically defined in the case law-- is necessarily an element of a plaintiff's § 1981 claim. As stated before, to prove a violation of the statute, a plaintiff must show only that: "(1) [s]he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against h[er] on the basis of race; and (3) the defendant's discriminatory conduct *abridged a right enumerated in section 1981(a)*." *Amini*, 440 F.3d at 358 (emphasis added). To prove the third element, the plaintiff need only show that a

14

right enumerated under § 1981 was abridged as a result of the defendant's discriminatory conduct.[4] Section 1981 protects a non-white person's "right . . . to make and enforce contracts . . . as is enjoyed by white citizens" and defines the right "to make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981. Id. § 1981(b). A right protected under § 1981 may be abridged without necessarily causing a "materially adverse change in the terms of [the plaintiff's] employment," as that term has been defined.[5] *See Kocsis*, 97 F.3d at 886.

Furthermore, this Court believes that even a temporary or brief (i.e. *de minimis*) abridgement of a plaintiff's rights under § 1981 is actionable. As one district judge in the District of Maryland expressed in an instructive case,

> Section 1981 violations need not be extended or unmitigated to qualify the plaintiff for damages. Although the length or nature of the violation may affect the plaintiff's award, the fact that an act of contractual discrimination was short or *de minimis* does not make it any less a

---

[4] The existence of an "adverse action"-- as that term is typically defined-- appears to become relevant only with respect to the plaintiff's proof of the defendant's intent to discriminate against the plaintiff on the basis of race, and *only if* the plaintiff needs to rely on the burden-shifting *McDonnell Douglas* framework to prove her claim. *See Amini*, 440 F.3d at 358; *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

[5] As the Supreme Court has provided, an adverse employment action typically involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing a significant change in benefits. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

> violation. Indeed, "[c]ivil rights are founded not on a relativist calculus of discriminatory behavior but on the principle that deprivations of rights resulting from racial animus are unlawful."

*Williams v. Cloverland Farms Dairy, Inc.*, 78 F. Supp. 2d 479, 485-86 (D. Md. 1999) (quoting *Yates v. Hagerstown Lodge No. 212 Loyal Order of Moose*, 878 F. Supp. 788, 796 (D. Md. 1995)); *see also Patterson*, 2005 WL 6720844, at *9 (finding support for the plaintiff's § 1981 claim arising from the notation in a patient's record of "no black RNs", finding "it . . . clear that, even in the absence of a monetary loss, job assignments based on race constitute adverse employment actions because such assignments affect the terms and conditions of employment."). The Court further believes that it is a question for the jury as to whether Plaintiff's one encounter with a racist patient and, perhaps more importantly, Defendant's response to the patient, were sufficient to alter the terms and conditions of her employment.

The Sixth Circuit's unpublished decision in *Crane v. Mary Free Bed Rehabilitation Hospital*, -- F. App'x --, 2015 WL 8593471 (2015), does not otherwise lead this Court to conclude that Plaintiff's claims fail. There, the Sixth Circuit upheld the grant of summary judgment to the defendant on the plaintiff's § 1981 claim because, in addition to suffering no material change in the terms or conditions of her employment, the court found that "[a]ny potential exclusion from the patient's room was not a removal of responsibilities because [the plaintiff] was not responsible for direct patient care." *Id*. at *5. Plaintiff, in comparison, was responsible for direct patient care and, on two occasions, was actually excluded from a patient's room and

16

removed from her responsibilities for caring for the patient. Even if *Crane* instructs that the infringement on a plaintiff's § 1981 rights must be more than *de minimis* to survive summary judgment, viewing the facts in a light most favorable to Plaintiff, the Court believes a reasonable jury could find that this incident had more than an insignificant impact on the terms and conditions of her employment.

For these reasons, the Court finds sufficient factual disputes to render Plaintiff's § 1981 and ELCRA claims better resolved by a jury than a judge.

Accordingly,

**IT IS ORDERED**, that Defendant's motion for summary judgment is **DENIED**.

                                                  s/ Linda V. Parker
                                                  LINDA V. PARKER
                                                  U.S. DISTRICT JUDGE

Dated: March 16, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, March 16, 2016, by electronic and/or U.S. First Class mail.

                                                  s/ Richard Loury
                                                  Case Manager